# Lilley's Estate.

*Wills—Perpetuity—Illegal devise—Intention—Trusts and trustees.*

1. A perpetuity is any limitation or condition which may take away or suspend the absolute power of alienation for a period beyond life or lives in being and twenty-one years thereafter. If there is any possibility that a violation of this rule may happen, the devise is void.

2. The rule is to be applied after testator's intentions are discovered; its object is to defeat a manifest intention which is contrary to a well recognized policy of the law.

3. The rule has to do with future estates, which, by possibility, may not become vested within the time prescribed by law; it applies only to future estates which are contingent, and has no application to vested estates.

4. If an absolute term of years is specified by the testator, and no anterior term for a life in being is referred to, such absolute term cannot be longer than twenty-one years from testator's death. The rule applies to both equitable and legal estates.

5. Where a testator creates an active trust in two nephews, named as executors, and their successors, to collect, invest, accumulate, conserve and divide the property at the end of ninety-nine years, and provides that no portion of the estate, either principal or income, shall be parted with during that period, and that final distribution shall be made to the heirs of the two nephews living at that time, the gift is contingent, as there can be no vesting until the identity of the persons to take is determined, and the devise violates the rule against perpetuities.

6. The prior estate held by the executors falls with the gift, and a resulting trust arises in the heirs at law and next of kin of the testator.

7. Where the provisions creating the particular estate in trust are inseparable and dependent parts of the testator's main scheme to tie up his residuary estate in the ultimate gift, and thereby prevent the vesting until a date too remote under the rule, such provisions, including all the agencies or means designed to accomplish the desired and forbidden end, are void.

*Wills—Perpetuities—Illegal devise—Trusts and trustees—Mining coal—Royalty agreement — Inseparable illegal purpose — Option—Time for acceptance necessary.*

8. Where a testator owning a controlling interest in the shares of a coal company and an absolute estate in a large acreage of coal, gives such estate to trustees, with active duties, to hold for ninety-nine years, and the terms of the will show an obvious purpose to violate the rule against perpetuities, a direction in the will 'that the "coal may be opened up and worked on a royalty to suit the company" is null and void.

9. As such provision was the chief instrument to accomplish the illegal purpose of the will and was inseparably connected with such purpose, it fails with the illegal trust created by the will.

10. Even if it should be considered as separable from the will, and for the benefit of the corporation, it fails, because (1) it is not a devise upon a condition subsequent; (2) it is not a gift; (3) it could not become effective until the trustees entered into a contract with the company, and they had no power to do so; and (4) it was not an option, as no time for acceptance was stated.

Argued October 3, 1921. Appeals, Nos. 98 and 100, Oct. T., 1921, by Thomas Elliott and Jacob Elliott, Executors, and Lilley Coal & Coke Co., Intervener, from decree of O. C. Washington Co., May T., 1920, No. 50, refusing executors' petition to execute an agreement, in estate of Thomas E. Lilley, deceased. Before MOSCH-ZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Affirmed.

Petition of executors to execute a royalty agreement. Before HUGHES, P. J.

The opinion of the Supreme Court states the facts.

Petition dismissed. Thomas Elliott and Jacob Elliott, executors, and Lilley Coal & Coke Co., intervener, appealed.

*Error assigned,* inter alia, was decree, quoting it.

*M. W. Acheson, Jr.,* with him *Acheson & Crumrine, Sterrett & Acheson, Cottom & Cottom* and *Wiley, Marriner & Wiley,* for appellants.—The benefaction in favor

of the Lilley Coal & Coke Company in item 10 of the will is not associated with the decedent's residuary dispositions: Whitman's Est., 248 Pa. 285.

Item 10 itself does not violate the rule against perpetuities: Newell's App., 24 Pa. 197; Singerly's Est., 14 Phila. 313.

*Richard G. Miller,* with him *J. Olan Yarnall, R. H. Meloy, McIlvaine, William & McCreight, J. C. Davies, Francis A. Dunn* and *John H. Donnan,* for appellees.— Item 10 is part of the general scheme and dominant purpose of the will, and is inseparable therefrom.

If item 10 were separable from the will as a whole, it would be nothing more than the grant of an option to Lilley Coal and Coke Company, or a discretionary power in the executors, and would in itself violate the rule against perpetuities: Ludwick's Est., 269 Pa. 365.

OPINION BY MR. JUSTICE KEPHART, January 3, 1922:

This is an appeal from a decree of the court below refusing to grant authority to the executors of Thomas E. Lilley to join in and execute a proposed royalty agreement; while the decree of the court below denied the prayers of the petition, its effect was vastly more comprehensive, for, to deny the requests, the validity of the will must be attacked. The executors, and others interested, have taken this appeal. The proceedings are complicated, and it is necessary to briefly recite those upon which the decision must rest.

Thomas E. Lilley, aged seventy years, by occupation a farmer, resided in Washington County, Pa. He died January 5, 1920, unmarried, and his surviving relatives were his sister, Jane Elliott, with her two children, Thomas and Jacob Elliott, and two children of a deceased brother, Charles and Walter Lilley. Deceased was worth, approximately, $2,000,000. His holdings consisted of personal property valued for taxation in round numbers at $1,700,000, and real estate at $725,000.

He was one of the promoters of the Lilley Coal & Coke Company, which was prosperous and in excellent financial condition. He owned 1,620 of its 2,000 shares, and, in 1912, transferred to it by lease four hundred acres of coal at a royalty of twenty cents a ton, with a minimum of $40,000 a year, and, in 1918, one hundred and seventy-five acres at a royalty of thirty cents a ton. When he died, the company had five hundred and twelve acres of coal unmined.

In his real estate, enumerated in the appraisement, was a block of Pittsburgh coal, approximately 1,750 acres, in West Bethlehem and Amwell Townships, of the value of $625,000; this piece of land is the subject of the present proceeding.

An examination of the will of Thomas Lilley shows that he evidently wrote it; in places it is inartistically phrased, particularly the part controlling the question now before us. By it his sister's children, Thomas and Jacob Elliott, are given the proceeds of his farms, $2,000 a year to burn lime, and a like sum to keep them in repair. Jacob must live on the farm, at a yearly salary of $1,500; if he does not, everything "willed to him is to be void and of no effect, and in that event Thomas Elliott is to live on the farm." And, if Thomas refused to do so, everything willed to him was to be void, and Etta Lilley was to have "everything, to hold the same in trust for ninety-nine years." Thomas was to be president of the Lilley Coal Company and to receive two hundred shares of its stock; fifty shares are given to persons named; $10,000 to Etta Lilley, and $5,000 to Charles Ullery. Taxes are to be paid out of the estate. These various gifts or directions constitute all the deductions to be made from this large estate.

The stock in the Lilley Coal & Coke Company is to be held in the estate, and, item 10, "the mines are to be run the same as they are at my death, and all other coal that I own or have an interest in, except the hill vein that is for the farm, can be opened up any place that suits the

company, and worked on a royalty to suit the company."
All accumulations of the estate are to be invested in
government bonds or coal lands.

Thomas and Jacob Elliott were appointed executors,
with power to select a successor. All the property, in-
cluding income from royalties, invested as directed, is
to be held for ninety-nine years; "at the end of ninety-
nine years [the] estate is to be divided between the heirs
of Thomas Elliott and Jacob Elliott, provided that each
complies with the terms and provisions of the will. If
they do not comply with the provisions of this will, then
and in that case, at the end of ninety-nine years, the es-
tate is to be divided between the heirs of Thomas El-
liott."

The Lilley Coal & Coke Company, by formal action,
accepted the rights and benefits bequeathed and devised
to it under item 10 of the will ("company" therein men-
tioned referring, by agreement, to that concern), de-
livering a copy of its acceptance to the executors and
offering to enter into a royalty agreement. Subsequent-
ly they executed and delivered to the executors an agree-
ment for the "other coal," or what is known as the Ross
Block; by it a royalty of twenty cents a ton was to be
paid, with a minimum of $50,000 a year. It is admitted
this price is adequate and fair.

The executors, Thomas and Jacob Elliott, under sec-
tion 28, clause C of the Fiduciaries Act, petitioned the
court for authority to join in this agreement. Charles
and Walter Lilley, nephews of the deceased, filed an
answer denying the company had any interest or right in
the coal land of Thomas Lilley, deceased, and that item
10, under which it claimed such interest or right, was
void, as offending the rule against perpetuities; and
that, Thomas E. Lilley having died intestate as to his
residuary estate, it passed to the surviving sister and
respondents, as next of kin and heirs at law.

The Lilley Coal & Coke Company appeared by peti-
tion, asserting its right under item 10, and was permit-

ted to be heard as a party. The Union Coal & Coke Company, having purchased the interests of the sister and the two nephews, intervened as a party to the proceedings. The Lilley Company maintained that item 10 was a devise of the Ross Coal, even if the ultimate gift of residuary estate was void as against perpetuities; that the devise of this block of coal was independent of and separable from the void or illegal provisions and limitations. The executors take the same position. The court below having determined the matter adversely to the original petitioners, the company and the executors each take an appeal from the decree.

Is testator's ultimate gift of his residuary estate to the heirs of Thomas and Jacob invalid and void because it violates the rule against perpetuities? If it does, are the interests or privileges contained in item 10 inseparable parts of the general scheme of testator to accomplish such unlawful result, so that, if the gift falls, all parts fall with it? Does item 10 violate the rule against perpetuities, considering its provisions separately from and unrelated to the general scheme of the will, so as to make an invalid gift?

A perpetuity is any limitation or condition which may take away or suspend the absolute power of alienation for a period beyond life or lives in being and twenty-one years thereafter. If there is a possibility that a violation of this rule may happen, the devise is void. It is void if persons, to take, may possibly not be ascertained before, or the contingency may happen after the expiration of life or lives in being at the creation of the interest and for twenty-one years and possibly nine months thereafter, or the expiration of twenty-one years after the creation of the interest (see Foulke on Perpetuities, page 185 et seq., and exception as to charities: Act of May 9, 1889, P. L. 173).

The rule is to be applied after testator's intentions are discovered; its object is to defeat a manifest inten-

tion which is contrary to a well recognized policy of the law.

The court below found, "The will evidences a fixed desire and dominant purpose on the part of the testator, to tie up and hold together his residuary estate in his name and grasp for a period of ninety-nine years following his death; before the expiration of which period, no portion of his estate is to vest in any person." We all concur in this finding. The title to the property was to remain all the time in his name and control. The motive advanced in such cases is a selfish one,—a reluctancy to give up property, even at death, and vanity, that a name might be perpetuated. Indeed, the contrary of this finding is not seriously contended.

There is no express residuary clause in the will, and what is left, after the few comparatively small deductions before referred to are allowed, will pass as undisposed of estate. The nephews mentioned were a secondary consideration to the estate that was to be accumulated. During the ninety-nine years no one gets a dollar of this vast income or property, except the small bequests mentioned. His estate and its accumulations consist of farms, coal lands, royalties from coal lands and shares of stock in coal companies, and he directs that these shares shall be held in his estate until distribution. He orders, or attempts to order, his coal lands to be disposed of by sale, and all accumulations of surplus therefrom, or from royalty, sales or otherwise, shall be invested and reinvested in government bonds or coal lands. The insignificant bequests only emphasize the prevailing thought in testator's mind, and, while he does not carefully instruct his executors as to their duties in the protection of this property (nor does he raise a specific trust for that purpose in others), his purpose, shown by a careful reading of the will, was to fix on the executors a trust responsibility,—not only through the manner and purpose of succession, but through specific directions as to future investments and

the upkeep of his property, the collection of royalties, dividends, interest on government bonds and other reinvestments. It was intended that the trust (applicable in a certain instance to Etta) should apply to Thomas and Jacob. This is a fair deduction from the will; an active trust is created in the executors and their successors for ninety-nine years, to collect, invest, accumulate, conserve and divide the property at the end of ninety-nine years. The duties imposed on the executors named in the will are beyond those of ordinary administration, and they officiate, if at all, as trustees under the will; the legal title of the residuary estate became vested in the executors, and will pass on to their successors until final distribution. Every provision, aside from the minor bequests mentioned, contemplates accumulation of capital and income in the residuary estate through the agency of this active trust (see Henderson's Est., 258 Pa. 510, 514; Perry on Trusts, 6th ed., section 312), to be distributed at the end of ninety-nine years to the heirs, that is, the surviving relatives, whether lineal or collateral, of his nephews, who, as their heirs at law or next of kin, would be entitled to receive such nephews' estate.

The rule against perpetuities has to do with future estates which, by possibility, may not become vested within the time prescribed by law; it applies only to future estates which are contingent, and has no application to vested estates: Phila. v. Girard's Heirs, 45 Pa. 11, 27; Lawrence's Est., 136 Pa. 354, 367; Johnston's Est., 185 Pa. 179, 185; Gerber's Est., 196 Pa. 366, 379; Barton v. Thaw, 246 Pa. 348, 352; Edward's Est., 255 Pa. 358, 365. In the Lilley will the postponement is for the benefit of those entitled to take on distribution; it is not postponed to accommodate the estate or let in other interests; there are no intervening estates. The gift, as implied from the direction to divide, is thereby postponed; the vesting of ownership is put off, not merely the possession or enjoyment of it: Moore v. Smith, 9 Watts 403,

407; Kountz's Est., 213 Pa. 390, 395; Rosengarten v. Ashton, 228 Pa. 389, 394; Battenfeld v. Kline, 228 Pa. 91, 94; Rau's Est., 254 Pa. 464, 470; Evans's Est., 264 Pa. 357, 360; Hildebrant's Est. 268 Pa. 132, 135; Marshall's Est., 262 Pa. 145, 147; Groninger's Est., 268 Pa. 184, 190. Moreover, testator intends that only the heirs of Thomas and Jacob living at the expiration of ninety-nine years shall share. They take directly from the testator. The two nephews named have no vested interest in the residuary estate; only such heirs who may be living shall participate. It follows there can be, presently, no persons answering the description of the persons who can participate. Their taking is made contingent on surviving and being in existence at the termination of ninety-nine years.

The court below concluded that the ultimate gift was contingent, and in this conclusion we agree.

We stated that the rule against perpetuities affected dispositions taking effect beyond life or lives in being and twenty-one years. The testator does not adopt the plan of life in being, but uses a term of years. Under such circumstances, "if an absolute term is taken and no anterior term for a life in being is referred to, such absolute term cannot be longer than twenty-one years": Johnston's Est., 185 Pa. 179, 184; Perry on Trusts, 6th ed., section 380; Foulke, section 340; Barton v. Thaw, 246 Pa. 348, 355. There is nothing in the will that can be taken as measuring life or lives in being; the gift must be considered from the period of twenty-one years, if at all, and the interest against which the rule is directed must vest within the time prescribed by the rule, —here twenty-one years from testator's death. If the contingency noted may happen beyond that period, the whole interest limited is void: Coggins's App., 124 Pa. 10, 29; Gerber's Est., 196 Pa. 366, 380; Leisenring's Est., 237 Pa. 60, 67; Barton v. Thaw, 246 Pa. 348, 354; Penrose's Est., 257 Pa. 231, 233. As noted, it is not whether the contingency might actually happen, but it

is the possibility of its happening beyond the period that destroys the interest limited thereon; this is true with respect to the person who is to take, and the period of vesting takes effect from the date of the testator's death (Foulke, section 342; 21 R. C. L. 294; Lawrence's Est., 136 Pa. 354, 364; Bender v. Bender, 225 Pa. 434. 439, 440; Barton v. Thaw, 246 Pa. 348, 352); the same rules apply equally to equitable as well as to legal estates: 21 R. C. L. 305. No person is mentioned in connection with the ultimate gift, except the heirs of Thomas and Jacob, and they cannot exist until the death of these nephews, which may be beyond twenty-one years.

Applying, then, the rule, there is a clear violation in the gift, as the parties who are to receive it are unknown and cannot be known until the expiration of the time named, or until the death of the persons named. There can be no vesting until the identity of the persons to take is determined.

The prior estate held by the executors, as trustees, falls with the gift. No portion of the estate was to be parted with during this period; the "surplus" was to be collected and reinvested; all was to pass as a part of the ultimate gift; the accumulations could not vest in any one during the twenty-one years. Both capital and income reach the same destination, and at the same time; the gift comprising both is void. The Act of April 18, 1853, P. L. 503, prohibits accumulations except during minority, and, as there are no beneficiaries whatever during the prior period, such accumulations are contrary to the statute (see Billing's Est., No. 2, 268 Pa. 71, 74); the provisions of item 10 are merely a means toward the ultimate end, to wit, accumulating and capitalizing the vast income for the sole benefit of the ultimate gift, and such means must fall with the result here condemned. There were no intervening gifts or directions for the application of money during the prior estate, saving, of course, the small bequests and directions noted above; and those with reference to the farm

are not gifts,—they relate to keeping intact a part of the residuary estate.

A resulting trust thus arises in the heirs at law and next of kin when the gift and prior estate disappear. For the purpose of mere conservation and accumulation, equity would no longer continue the operation of the trust; the legal and equitable titles merge; there is no discretion vested in the trustee: Koenig's App., 57 Pa. 352, 355; Conley's Est., 197 Pa. 291, 295.

But the appellant contends that the case is ruled by Whitman's Est., 248 Pa. 285, 288, 289. It has been held that where the provisions creating the particular estate in trust are inseparable and dependent parts of the testator's main scheme to tie up his residuary estate in the ultimate gift, and thereby prevent the vesting until a date too remote, such provisions, including all the agencies or means designed to accomplish the desired and forbidden end, are void under the rule (Johnston's Est., 185 Pa. 179; Gerber's Est., 196 Pa. 366; Kountz's Est. (No. 1), 213 Pa. 390). It does not follow that, simply because the ultimate interests are void, the prior interests too must collapse; only offending limitations are void. "A prior estate neither receives enlargement nor suffers diminution when a remainder expectant upon it is declared void for remoteness (Lewis on Perp. 420; Johnston's Est., 185 Pa. 179); but in Pennsylvania, where the limitations of the prior and ulterior estates are so intimately and inseparably intertwined that the failure of the limitation of the latter disturbs the main and dominant purpose of the testator, of which the prior limitations are a part, such prior and ulterior estates are void; so, too, where the prior estate is but a mere agency to accomplish a transgression of the rule.

In the cases just noted, the wills directed payments in the prior estate much more specific than here, where there is none. In Whitman's Est., supra,—where the bequest was to the wife, if living, and, upon her death, to his daughter for life, free from the control of her hus-

band, and, upon the death of the daughter, to divide the principal among the latter's children in equal shares, the shares of the males to be paid to them on attaining majority, while those of the females were to continue under the same trust as to the daughter, with the remainder over to charitable institutions, if no heirs,— this court sustained the prior estates to the wife and daughter. We held the limitation over to the female grandchildren was merely incidental; the prevailing purpose of the will was to take care of the wife and her daughter; the only phase bringing it under the rule was, if female children should survive; if there should be all male children, or no children, which this court could not then determine, the will under consideration would not have offended the rule. But there is nothing in the particular estate under Lilley's will paralleling those in the Whitman case. There are no benefactors to receive any of the income accruing during the term of the particular estate.

It seems quite clear that, for the reasons here mentioned, the prior estate falls with the ultimate one, because they are dependent and inseparable parts of testator's main scheme and dominant purpose to make a gift of his residuary estate, so that the same shall vest at a period too remote under the rule.

Appellants urge that the benefaction in favor of the Lilley Company in item 10 is not associated with the residuary disposition, but is exclusively associated with admittedly valid specific bequests in other items of the will, or, if regarded as associated, it is certainly plainly separable therefrom; in any event, item 10 does not violate the rule against perpetuities. The part of it bearing specifically on the matter before us is the following: "All other coal that I own or have an interest in...... can [may] be opened up any place that suits the company, and worked on a royalty to suit the company."

Appellants' contention rests on a mistaken conception of the true purpose of item 10. Its provisions contem-

plate a sale of coal lands on a royalty basis, and it is a part of testator's plan whereby he raises, during the period of ninety-nine years, a large estate that cannot vest until a remote period, unlawful under the rule. Item 10 is the chief instrument to accomplish this illegal purpose, for, on the acreage mentioned, with mining conducted as effectively as under the present leases, an enormous estate would be worked out, the principal from this land alone yielding upwards of $2,750,000. The reinvestment of interest and accumulations each year, or the compounding of the yearly revenues, would raise, with the liquid estate now at hand, a sum of money that would be staggering, to say the least, as it appears to those of us who are not used to dealing in personal matters with such large figures. The average yearly income, as the present record would indicate, would amount to from $150,000 to $200,000.

Testator, through stock control in the company on one hand, and his legal representatives on the other, would take care of the royalties to realize the greatest possible benefit to his estate from the Ross Block of coal. Can it be doubted item 10 was drafted solely in aid of testator's primary purpose? The company was not to be benefited, nor its stockholders; nor were its small minority stockholders to be considered as specific beneficiaries. The will was not written with any idea of an association between item 10 and these shareholders. Testator did not consider relatives or persons; his mind was fixed on one specific object,—the amassing of a great estate, to be divided as his ultimate gift at the end of ninety-nine years. He surrounds these thoughts and ideas with every protection possible. His right hand guards his left. Instead of leasing to an independent company, one is selected that he practically owns; his estate thereby reaps the reward both ways through dividends as well as royalties. And every dollar from this great source of income goes into the residuary estate without the subtraction of a single cent. His dead hand is kept on it

throughout the entire period of ninety-nine years; the stock of the Lilley Company owned by him shall be held in his estate and shall not be transferred. Can it be doubted that the association of item 10 with the residuary estate was complete? In fact the item was created as one of the great channels through which the revenues from his vast holdings would pass.

But, if we consider item 10 separable from the will as a whole, it may be considered an option or a discretionary power, or a sole testamentary right in the Lilley Company to receive something.

"Other coal may be opened up and worked on a royalty to suit the company" is not a devise of coal upon condition subsequent, vesting immediately upon death, subject to acceptance of the condition by the beneficiaries within a reasonable time. It lacks the necessary word and elements to make it such. It has none of the properties of a gift, and he who seeks to take against the law of descent must show a satisfactory written title: Brendlinger v. Brendlinger, 26 Pa. 131, 132. The devise of the coal, upon royalty "to suit," as a condition subsequent, requires fixing the price before payment of that amount. But this cannot arise until the company has elected to take the land and the price has been fixed; until such election and fixing of royalty, the fee simple title cannot vest. "It seems to be of the very nature of a right to elect one of two things, that actual ownership is not acquired in either until it be elected": Ludwick's Est., 269 Pa. 365, 369. The authorities cited by appellant in this connection are not in point.

Royalty, as here used, means more than fixing a sum payable. It involves all the features usually incident to and included in the leasing of coal land, and primarily contemplates a contract, the essential ingredients of which are offer and acceptance, form and consideration, parties, etc. Until this is complete, no title would vest in the company. Under this situation, as we have already said, the executors must determine all matters

in connection with the contract.  They pass on the necessity, time, price and other matters.  It is not to be thought this matter was left solely to the discretion of the company, who might fix any amount (one cent, for example) as royalty.  It is not to be supposed testator intended to thus deplete his ultimate great fund, or the company could go where and as often as it willed over the surface land to open the coal.  It may be said reasonableness is all that is required.

The power lodged in the executors to so act was not mandatory, but permissive or discretionary; it is conceded item 10 is not self-executing, even by the interpolation of the language suggested by appellant, though that would be helpful.  That the Lilley Company so regarded item 10, appears by the resolution and tender of contract.  In dealing with the "other" coal, the company must be given the first chance.  But the vice of it all is, a power was conferred on the executors to act for the estate during ninety-nine years.  Now, the avowed purpose of the exercise of these powers was to create the estate we have just mentioned, which could not vest within the limited period, and, because all the interests to be created by such exercise of powers were to take effect at the remote period, the powers, the means of its creation, fell with the interest to be created.  There is no other reason for their existence, and the mere fact that an attempt was made to execute them within the time, would not avail, as they spoke from testator's death, and the rule is tested by possibilities, not actualities: Foulke, sections 335, 403 and 438; Coggins's App., 124 Pa. 10; Phila. v. Girard's Heirs, 45 Pa. 11, 27; Williams on Real Property, 22d ed., section 319.

Considered as an option to open up and work the coal of testator's land, there is no obligation to open, mine and pay royalties.  All must be predicated on an agreement, and there is no time specified for it or for the acceptance of the option,—neither may ever be accomplished.  Not only would the right to accept the

property be held for the period of twenty-one years, but it may continue for an indefinite time throughout ninety-nine years. The Lilley Company has elected to open up the Ross coal; there was another tract included in the term "other coal." When will the company elect to open this coal? Does it ever intend to do so? It seems to us this question has been fully answered by this court in Barton v. Thaw, 246 Pa. 348, where the covenant to sell was in the form of an option, without limit as to time of acceptance, and, while an option is a species of property subject to testamentary control (Remensnyder's Est., 267 Pa. 348, 350), it is not such where there is an absence of a limited time within which to accept it. The event upon which the estate was to arise, to wit, the acceptance of the option, is uncertain, being unconfined as to limit of time, the interest created thereunder is contingent and within the rule against perpetuities.

The fact that the option has been accepted within the twenty-one-year period cannot be considered; the court deals with the facts as they exist at the time of testator's death; such option is wholly void ab initio as to all privileges and interests attempted to be granted or appertaining thereto.

Conceding the powers to execute void, with the heirs and next of kin to take the ultimate estate arising therefrom at testator's death, with the will stripped of everything but the supposed testamentary right in the Lilley Company to get something, no effect can be given to this supposed right. It is based on testator's ultimate thought, so closely interwoven therewith that it is fairly to be assumed no such right would ever have been created had testator known that his ultimate gift was to fall. The general purpose of the will was unlawful, and we may add that such contingent testamentary right or interest thus left in item 10 is so indefinite and uncertain as to be unenforceable for any purpose; thus concluding, item 10 is invalid, illegal and void. Testator died intestate as to his residuary estate; it passes under

the law to his heirs and next of kin, Jane Elliott and the two Lilley nephews in fee.

Decree affirmed at appellant's costs.